[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs, Herbert Oppel, and his wife, Edna, were the owners of several pieces of property in Stratford, Connecticut, at the intersection of Lundy Lane and Beardsley Avenue, all of which was zoned commercial. Mr. Oppel had acquired these properties over a period of years and hoped in the future to build or have developed on the property a hotel or shopping center. Mr. Oppel was at the time of these acquisitions the Chief Plant Electrical Engineer at Avco-Lycoming in Stratford.
Some time in March of 1986 he was approached by a realtor with an offer to purchase his property by National Properties, Inc. for $310,000. He rejected the offer. The principals of National Properties were the "individually named defendants in this case. Shortly thereafter, however, negotiations continued concerning the formation of a limited partnership between the plaintiffs and the individual defendants, Penczer, Ryan, Rowan and Jarvis, to develop the plaintiffs' property and other CT Page 11674 property of the defendants. The basic plan was for the individual defendants to be the general partners and the plaintiffs to be limited partners. The plaintiffs would contribute their property to the venture and the individual defendants would contribute their expertise in property development. This took place by December of 1986. During these negotiations, the plaintiffs were being represented by Attorney William Smythe of Stratford.
It was also known to all parties involved that the partnership would acquire, in the future, other contiguous parcels to make the development of the assembled property more beneficial and ultimately more successful. The original plan for the property was to construct one 30,000 square foot office building, and when that was completed and rented, to build another 30,000 square foot office tower. The plaintiffs knew also that the partnership would be borrowing money to both acquire the additional parcels and then to build the structures.
Apparently, National Properties acquired its first contiguous parcel from James and Pamela Gelder, it being a portion of lot 42 and lots 43 and 44 as shown on defendant's exhibit four, on October 22, 1986, for $175,000. That purchase was financed by Connecticut Bank Trust by a commercial note and mortgage. National then acquired, on December 30, 1986, lots 22, 23 and 24, as shown on defendant's exhibit 4, from Bolmer, Becker and Henry for $145,000, which was also financed by Connecticut Bank Trust through a commercial note and mortgage.
On January 29, 1987, the plaintiffs executed the partnership agreement forming Beardsley Avenue Associates Limited Partnership from their full time home in Florida. The named defendants all executed the agreement on February 4, 1987. (See plaintiff's exhibit B.) On January 29, 1987, the plaintiffs also conveyed all of their property fronting on Beardsley Avenue and Lundy Lane to the partnership, subject to a $12,000 mortgage from the plaintiffs to Mechanics Farmers Savings Bank, which the partnership eventually paid off. To complete the assemblage of the partnership property, Elizabeth C. Seeley, Trustee, on July 29, 1987, conveyed lots 22, 23 and 24, on defendants' exhibit four, to the partnership; National Properties on July 29, 1987 conveyed 1/2 of lot 42 and lots 43 and 44 to the partnership and the partnership, on July 28, 1987, acquired another contiguous property from Home Design Builders, Inc. for $225,000. All of these transfers were accommodated by the draw down of $592,000 from a new mortgage in the amount of $700,000 from the CT Page 11675 Connecticut Bank Trust Company executed on July 29, 1987.
The partnership agreement, insofar as it applies to this case, is significant for the following facts: (1), under Article I, the general partners had authority to develop the property at Beardsley Avenue and Lundy Lane and to construct buildings, all at their own discretion; (2) Article III provided that the general partners would make no capital contributions; and (3) Article IV provided how profits would be disbursed and how the plaintiffs would get early distribution to reimburse them in the amount of $500,000, which was the figure assigned to their contribution of property to the partnership.
The partnership embarked on the development of a plan for an office park. Apparently that remained the focus of their plan until early 1988. Then, based on their own analysis of market conditions, including the general down turn in the real estate market and the glut of office space available and unrented, the general partners decided it would be more prudent to switch the development to a retail center. Their own analysis demonstrated that that market was "under retailed." In the interim, they had also applied for zone changes to commercial for some of the newly acquired property, attempted to acquire additional property, and did planning, marketing, architectural and engineering work.
Once the plan was changed to retail in May of 1988, the partnership filed additional zoning requests for a restaurant, drive through bank as well as beginning site work and demolition of some of the residential buildings on the property. It also began investigating financing which culminated in a $3,000,000 construction loan from First Constitution Bank on August 30, 1989. The first draw down on that loan of $900,000 was used to pay off the $700,000 loan to Connecticut Bank Trust and the balance for related construction expenses of the partnership. On all these loans, the individual general partners were required to personally guarantee the loans.
From August 30, 1989 until May 30, 1990, construction on the building proceeded, including site work, demolition, installation of footings, steel framework and the construction of three sides of masonry walls. The partnership drew down an additional $450,000 on its mortgage for this work. One of the conditions of the mortgage was that the bank would not make future advances unless the partnership could demonstrate that it had a lease for 3,000 square feet acceptable to the bank. Despite all efforts to CT Page 11676 accomplish this, the partnership was unable to do it, and the bank notified the partnership that no further advances would be made for construction or the payment of interest. All construction ceased in the summer of 1990, the mortgage went into default for nonpayment of interest and foreclosure was commenced on October 2, 1990. The partnership lost its interest in the partnership some time in 1991.
Evidence was presented (see plaintiffs' exhibits W1, W2 and W3) that National Properties, Inc. on April 30, 1989, executed a Commercial Open-End Note, Commercial Revolving Loan Agreement and Guaranty Agreement, all evidencing the same obligation, to First Constitution Bank in the amount of $500,000. The guaranty was signed by Pencer, Rowan, Jarvis and Ryan. This loan was eventually secured by a second mortgage on other property of National Properties on King's Lane. None of the proceeds of this loan was ever used by Beardsley Limited Partnership and Beardsley never advanced any payment on behalf of this loan. Apparently, however, a default on that loan by the guarantors, who were the same guarantors of the Beardsley Limited Partnership mortgage, could trigger a default of the Beardsley loan. There is, however, no evidence that a default on that loan caused the default and ultimate foreclosure of the Beardsley mortgage. The reasons for that default and foreclosure have been stated previously, and will be discussed further.
The plaintiffs in this case apparently learned of the default, foreclosure and loss of the property some time in 1992. when their son advised them that he saw a for sale sign on their former property. No explanation was offered for this lack of communication. The plaintiffs immediately began to communicate with the partnership and National Properties as to what had happened. They received responses both from Attorney Bernard Green and David Leigh, a certified public accountant, on behalf of the partnership. What few answers they got were more than likely unsatisfactory to the plaintiffs because the property was gone. However, they had made the conscious choice to participate in the partnership venture rather than sell their property to the partnership or National Properties.
On subsequent visits to Connecticut, Mr. Oppel was shown the books of the partnership, was provided a balance sheet or spread sheet of all of its activities and on later occasions both his attorney, Mr. Trembicki and his accountant, Mr. Cleary, were given access to all of the partnership's records. The CT Page 11677 partnership's comptroller, William Mavrides, testified that no payments were ever made to the general partners for services or expenses and that all funds of the partnership went to pay for land acquisition, construction costs and related expenses.
The plaintiffs brought suit in 1995 against the partnership and are presently pursuing their claims as to counts one, two and four of the Amended Complaint. In the first count, they are claiming breach of the partnership agreement; in the second count, violations of Connecticut General Statutes § 34-9
through § 34-38 and in the fourth count, violations of the Connecticut Unfair Trade Practices Act.
Prior to trial, a motion for abatement of suit as to the defendant, the Estate of John Jarvis, was granted, so that the Jarvis estate is no longer a party to this action.
The plaintiffs' first argument is that the defendants breached their agreement with the plaintiffs by failing to pay a distribution to them out of the proceeds of the $700,000 mortgage to Connecticut Bank Trust on July 29, 1987, and the eventual construction mortgage to First Constitution Bank in the amount of three million dollars on August 30, 1989. They rely on Article IV of the partnership agreement, specifically Section 4.01(a), entitled "Distribution of Cash Flow, Refinancing Proceeds and Sale Proceeds." Their reliance on this section is misplaced. Any fair reading of the section, which was designed to return to the plaintiffs their initial capital contribution of their property on a priority course from cash flow, sale or refinancing, clearly establishes that this would only apply upon the completion of the project. The proceeds of the $700,000 mortgage to Connecticut Bank Trust were used to retire earlier debt occasioned by land acquisition, new land acquisition and expenses of the partnership. There was nothing to distribute.
Thereafter, the construction mortgage in the amount of three million dollars was placed on the property and, out of the first draw in the amount of $900,000, the Connecticut Bank Trust Company's mortgage of $700,000 was paid off. The balance of $200,000 from that advance and an additional $450,000 advanced thereafter were all used for planning, development and construction costs associated with the project. No distribution to the plaintiffs from the construction mortgage proceeds was due under the partnership agreement. CT Page 11678
The court concludes that all proceeds from the loan from Connecticut Bank Trust and the advances on the construction mortgage to First Constitution Bank were used in full to either discharge prior debt, acquire additional property or pay necessary expenses related to the development and construction of the project and there was, in fact, no cash flow available to the limited partners.
The plaintiffs next argue that the defendants breached their fiduciary duty to the plaintiffs by (1) commingling loan accounts and (2) cross collateralizing a National Properties loan with a Beardsley Avenue Association loan. They then cite Connecticut General Statutes § 34-17 and paragraph 5.05 of the partnership agreement (plaintiff's exhibit B) which describe the fiduciary duty owed by general partners to limited partners.
The plaintiff's claim of commingling apparently arises out of the testimony of William Mavrides, the comptroller of National Properties, who testified as to the bookkeeping procedures of National Properties and the several entities, such as Beardsley Avenue Associates, that it and the general partners were involved in. Mavrides testified that National would borrow money and then lend it to entities such as Beardsley Avenue Associates. He took great care in keeping these amounts separate and each month each entity, such as Beardsley, would be charged its individual obligation on its borrowing from National. The plaintiffs had both their attorney and their accountant review all of the defendants' books, and no evidence was offered by the plaintiffs that would suggest any claim of commingling.
With reference to the claim of cross-collateralizing, the claim is directed to the inter-relationship between the construction loan in the amount of three million dollars to Beardsley Avenue Associates, which was guaranteed by the individual general partners, and a loan to National Properties by Constitution Bank four months before on April 30, which was also guaranteed by the same four general partners of Beardsley Avenue Associates.
After reviewing all of the evidence, the court find there is no evidence of cross-collateralization. No evidence has been offered to establish that assets of Beardsley Avenue Associates were used to collateralize loans to other entities or assets of other entities were used to collateralize loans made by Beardsley. CT Page 11679
There is no question that the general partners of Beardsley Associates acted as guarantors of a commercial open end note from National Properties to First Constitution Bank in the amount of $500,000 on April 30, 1989. There is no dispute that in the three million dollar construction loan to Beardsley from First Constitution on April 30, 1989, also guaranteed by the general partners, there is contained a clause that created a default in the construction loan if one of the guarantors was also a guarantor on another loan that was in default. Apparently, the $500,000 loan was in default as evidenced by plaintiffs' exhibits Q, R and T.
If that default was the cause of the eventual default and foreclosure of the Beardsley Avenue Associates construction mortgage, the plaintiffs might have a valid claim, but that is not the case. This default and eventual foreclosure and loss of the property of Beardsley Avenue Associates was caused by its inability to produce a lease for 3,000 square feet "of space in the shopping center satisfactory to the bank, which was a condition for any future advances on the construction mortgage. This is evidenced by the various letters from the bank to the partnership and the efforts both before any and after any default by the general partners to find tenants.
When they failed to meet this condition and could not make interest payments on the money already borrowed and could not proceed with construction because of the inability to get new advances, the project ceased and the foreclosure was initiated and completed. Although it may be argued that a default by the guarantors on the National Properties $500,000 loan gave the bank the legal ability to declare a default on the Beardsley construction mortgage, the court concludes that was in fact not the cause of the default. The cause of the default was the failure of Beardsley to lease 3,000 square feet of space in its center which was a condition for any future advances on the construction mortgage.
The plaintiffs' next argue that the claimed cross-collateralizing by the defendants of Beardsley Avenue loans and finances with loans to unrelated entities constitute gross negligence and fraud and a breach of contract. Based on the court's previous holdings on this subject, the court finds that the plaintiffs have not proven this claim. CT Page 11680
The plaintiffs' lastly argue that the actions of the defendants in commingling the assets of Beardsley Avenue Associates with a note to National Properties constituted a violation of the Unfair Trade Practices Act ("CUTPA"), Connecticut General Statutes § 42-110a, et seq. Based on the court's earlier conclusions that there was no evidence of any commingling or any cross-collateralizing that led to the foreclosure of the construction loan, the plaintiffs have also failed to meet their burden of proof on the CUTPA count.
Based on the foregoing, judgment will enter for the defendants as to Count 1, Count 2 and Count 4. Although not specifically addressed, the court finds that the plaintiffs have failed to establish the claims set forth in Count 2. The plaintiffs have withdrawn Count 3 of the amended complaint.
Gormley, J.